*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| Steven C. Jemison, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. Action No.: 17-13571 |
| | : | |
| | : | **OPINION** |
| Michael S. Jemison, in his capacity as | : | |
| trustee for the Jemison Family Trust and | : | |
| in his capacity as president and co- | : | |
| chairman of the board of directors of | : | |
| JJKL, Inc. F/K/A Heyco, Inc.; and | : | |
| William D. Jemison, in his capacity as | : | |
| Trustee for the Jemison Family Trust | : | |
| and in his capacity as Co-Chairman of | : | |
| the Board of Directors of JKL, Inc. | : | |
| F/K/A Heyco, Inc., | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WOLFSON, U.S. Chief District Judge**:

Plaintiff Steven Jemison ("Steven"), a former shareholder of Heyco, Inc. ("Heyco" or the "Company") and a co-trustee and beneficiary of the Jemison Family Trust, initiated this action against his brothers, defendants William D. Jemison ("William") and Michael S. Jemison ("Michael"), who are former officers and members of Heyco's Board of Directors and co-trustees and beneficiaries of the Jemison Family Trust. In his Complaint, Plaintiff alleges that between 2012 and 2017, certain transactions were approved by Defendants without any discussion or input of their co-trustees and co-beneficiaries, breaching their fiduciary duties to both the Jemison Family Trust and Heyco's shareholders. Michael and William (collectively, "Defendants") now

1

move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, Defendants' motion is **GRANTED.**

## I.      Factual Background and Procedural History

### A.      The Jemison Family Trust and the History of Heyco

The parties to this action are siblings and the co-trustee of the Jemison Family Trust, along with their sister Susan Jemison ("Ms. Jemison").[1]  ECF No. 44, Def. SOMF ¶101.  The trust was formed by their father, William H. Jemison, the initial trustee, on November 30, 2019, and the four siblings are the beneficiaries of the trust and have equal interests in the Trust's assets.  *Id*. at ¶101.  The Trust Agreement provides that it is to be governed by New Jersey law, and the rights of the trustees include the ability to vote to exercise or sell any shares.  *Id*. at ¶¶177, 178.  Pursuant to the Trust Agreement's terms, upon their father's death in 2010, the four siblings became co-trustees of the Trust, in addition to being its beneficiaries.  *Id.*  at ¶¶101, 177.  The Trust's primary asset is the majority of the of the voting shares of Heyco, Inc, ("Heyco"), a company founded by the siblings' grandfather, Horace Heyman, along with Ferdinand Klumpp in the early 20th century.  *Id*. at ¶¶1, 100.

At the time of the founding, and all relevant time since then, Heyco was a holding company for two wholly-owned subsidiaries:  Heyco Metals, Inc. ("Metals"); and Heyco Products, Inc. ("Products").  *Id*. at ¶2.  Metals produced "rolled-strip products," made primarily from copper and copper alloys, pursuant to customer orders, with a focus on the electronic connector market.  *Id*. at ¶¶4-5. Products, in turn, manufactured electrical connectors using raw materials supplied by Metals and other mills.  *Id*. at ¶6.

---

[1]      Ms. Jemison is not a party to this lawsuit.

Through the Jemison Family Trust, the Jemison siblings own 70% of Heyco's voting shares. *Id*. at ¶¶100, 186. The remaining shares are owned by non-parties, Hank Klumpp and Harry Largey, the nephew and son-law, respectively, of Ferdinand Klump, co-founder of Heyco. *Id*. at ¶¶ 107, 118.

### B.    Heyco's Board of Directors

Heyco's Board of Directors consists of four members: Michael, William,  Mr. Klumpp and Mr. Largey.  *Id*.  ¶¶107, 121.  Both Mr. Largey and Mr. Klumpp were employees of Heyco, at some point, and remained on the Board of Directors after their respective retirements.  *Id*. at ¶¶114, 115, 121, 122

William began working for Products in 1981, and became president of that subsidiary in 1986 – a position he held through 2016, when Products was eventually sold.  *Id*. at ¶¶102, 141. Similarly, Michael began working for Metals in 1979, when he was named president of that subsidiary – a position he held until Metals was sold.  *Id*. at ¶103. In addition, both William and Michael were on Heyco's Board of Directors from the mid-1980's and at all times relevant to the instant lawsuit.  *Id*. at ¶104.  Neither Susan nor Plaintiff were members of the Company's Board of Directors.  Def. SOMF ¶¶105-106.  According to Plaintiff, "there was talk [of having him] join the board," but "[i]t never got that far.  It was more like we should really add you to the Board, and that's about as far as it went."  Pl. Resp. SOMF ¶105; *see also* Ex. [2] D., Deposition of Steven Jemison ("Steven Dep.")  T64:16-65:13.

Heyco held regular board meetings, at least once a year.  Def. SOMF ¶40.  In anticipation for the Board meetings, documentation would be sent to the Board of Directors, as well as the

---

[2]    All of the exhibits referenced in this Opinion are appended to ECF No. 44-2, Declaration of Joanna Piorek.

Jemison Family Trust, and the other shareholders. *Id*. at ¶41. Although Steven was invited to attend the board meetings, he did not do so. *Id*. at ¶43.

In this litigation, Plaintiff challenges three discrete corporate actions which occurred between 2012 and 2017: 1) Heyco's issuance, and subsequent forgiveness, of two $500,000 loans to Michael and William; 2) the commission payments to Michael and William in connection with the sale of Products to a third-party; and 3) the sale of Heyco Metals to Hummock Holdings, a company owned by Michael and his children.

### C.      The Loans to Michael and William

As presidents of Products and Metals, respectively, both Michael and William received a salary from the company, the amount of which was voted on and approved by the Board of Directors. Def. SOMF. ¶¶187,188.   In 2008, following the recession, both brothers voluntarily agreed to take a reduction in their base pay. *Id*. at ¶188.  In 2012, William and Micahel received annual salaries of $437,500; which increased in 2013 to $480,000 where it remained in 2014. *Id*. at ¶189. In 2015, their salaries increased to $540,000, where they remained through 2016. *Id*.

On May 18, 2012, William took a $500,000 loan from Heyco. *Id*. at ¶192; *see also* Ex. EEE, May 2012 Promissory Note.  A few months later, in November 2012, Michael also took a $500,000 loan from the Company.[3]  Def. SOMF ¶193.  Both loans were structured the same way and provided for the brothers to repay the loans, with interest, in $50,000 annual increments. *Id*. at ¶197.  However, the loans were never repaid. Def. SOMF ¶¶1, 198; Pl. Resp. SOF ¶198.  Rather, they were forgiven by the Company, by way of director compensation, over the course of the next four years.  Def. SOMF ¶198; Pl. Resp. SOMF ¶198.

---

[3]      Although there is a promissory note evidencing the loan to William, the promissory loan for Michael's loan, to the extent one exists, is not included in the record.  Nonetheless, it is undisputed that Michael took a $500,000 loan from the Company.

4

At the December 17, 2012 meeting of the Board of Directors, the Board voted to approve the loans, and also, simultaneously, to forgive William and Michael's first $50,000 payment. Def. SOMF ¶¶195, 198; *see also* Exhibit NN, January 11, 2013 email from Heyco's accountant (noting that the loans were "unanimously approved" at the December 17, 2012 Board meeting); Ex. H, 2012 Heyco, Board of Directors Meeting Book, 481-83. The same forgiveness from the Board also occurred during the years 2012, 2013, and 2014. Def. SOMF ¶198; *see also* Ex. I, 2013 Heyco, Board of Directors Meeting Book at 565-70; *see also* Ex. J, 2014 Heyco, Board of Directors Meeting Book at 645-50. Then, in 2015, the remaining $300,000 balance of the loan, plus accrued interest, was forgiven. Def. SOMF ¶198; *see also* Ex. K, 2015 Heyco, Board of Directors Meeting Book at 776-80.

The parties dispute precisely why the loans were paid out, and to what extent the shareholders, specifically Plaintiff and Susan, were aware of the decision prior to the loans being approved by the Board. Plaintiff asserts that "[William] and Michael sought the loans because they were purchasing real property and did not want to use their retirement funds or other investment assets to make the purchases." Pl. SOMF ¶12; Def. Resp. SOMF ¶12. Defendants dispute that contention, arguing that the loans were intended to be a form of director compensation, and "in the years prior to taking the loans, Defendants' base pay had been static from 2001 to 2008 at which time they voluntarily cut their pay." Def. Resp. SOMF ¶12. Plaintiff also asserts that "[t]here was no Trust meeting held, no vote of the co-trustees, no prior notice to the beneficiaries, and no effort to obtain approval from Steven and Susan in advance of the Board's decision to approve both the loans and their forgiveness." Pl. SOMF. ¶18; Def. Resp. SOMF ¶18. However, Plaintiff and Susan were provided with the Notices of the Annual Meeting and the Board Books in advance of each meeting. Pl. SOMF ¶11; Def. Resp. SOMF¶ 11.

Between 2012 and 2015, when Heyco forgave the loans, it consistently issued dividends to shareholders.  Def. SOMF ¶202, Pl. Resp.  SOMF ¶202.  In 2012, for example, Heyco made four distributions to its shareholders, payments which in aggregate totaled $2,531,613.50.  Def. SOMF¶ 9; Pl. Resp. SOMF ¶9.   Similarly, it paid out total dividends of $4,083,457.95 in 2013; $5,487,140.62 in 2015; and $4,062,743.10. in 2015.  Def. SOMF¶ 9; Pl. Resp. SOMF ¶9.

### D.     The Sale of Products and the Commission Payments to the Board

In September 2016, Products was sold to Penn Engineering for $130 million.  Def. SOMF. ¶9.  In 2013, prior to the sale, Heyco enlisted an investment banking firm, DunnRush & Co. ("Dunn Rush"), to value Products.  Def. SOMF ¶207.  Dunn Rush concluded "the current enterprise value of Heyco Products to be between $80 and $100 million (excluding cash on Heyco's balance sheet). A premium valuation could be achieved with a strong competitive process." *Id*. at ¶208; *see also* Ex. X, December 2013 Valuations.   Thereafter, William sought to increase the value of Products by expanding its products line.  Def. SOMF ¶210.  In October 2015, Dunn Rush conducted a new valuation of Products and valued it between $100 million and $120 million.  Def. SOMF ¶211; *see also* Ex. Z, October 2015 Valuation.

Following the 2015 valuation, toward the end of 2015, William and Michael, proposed the idea of selling the Products division, and the Board agreed to begin explore selling both divisions. Def. SOMF ¶¶213, 217, 218.  On November 6, 2015, the Board executed a Unanimous Written Consent which provided that the Board had determined that senior management should receive a bonus from any sale, in light of the fact that  "the expectation of large values for Heyco Products, Inc. and Heyco Metals, Inc. [was] due to management's sustaining and increasing gross margins, mitigating overhead and innovating into new product lines while never failing to pay a dividend or decreasing the dividend paid over that paid in the preceding year." *Id*. ¶¶220, 221; *see also* Ex.

K, November 6, 2015 Unanimous Written Consent.   The Unanimous Written Consent provided that a closing bonus of 7.5% "of the net proceeds of [the sale of each subsidiary] be set aside for payment" to William and Michael.   Ex. K, November 6, 2015 Unanimous Written Consent. During his deposition, Michael explained that "[t]he split was based upon the involvement of each as to the subsidiary sold. Thus, if Products sold, William would get 80% of the 7.5% commission, or 6%, and Michael would get the remaining 1.5%. Conversely, if Metals sold, [Michael] would get 80% of the 7.5% commission, or 6%, and William would get the remaining 1.5%." Def. SOMF ¶221.  The Unanimous Written Consent also provided that the Board "anticipated that in the event of a sale of either or both of the Corporation's subsidiaries, a prospective purchaser [would] investigate the financial history, the operational history and the corporate and personal history of the target company, its officers, directors, employees and shareholders ("Due Diligence")" and that "in order to furnish appropriate responses to requests for Due Diligence, it is likely that Henry Largey and Henry Klumpp, not in their capacity as Directors but as persons with a long and committed relationship with the Corporation, [would] be called upon to devote considerable time and effort in furtherance of one or more transactions."  Def. SOMF ¶222; *see also* Ex. K, November 6, 2015 Unanimous Written Consent.  Accordingly, the Board also agreed to provide payment of a .68% commission to both Mr. Klumpp and Mr. Largely.  *See* Ex. K., November 6, 2015 Unanimous Written Consent.

On November 18, 2015, William sent an email to Plaintiff and Susan advising them about the Unanimous Written Consent and the potential sales.  Def. SOMF ¶226; *see also* Ex. PP, Email Chain of 11/18/2015.  In relevant part, the email provides that "[s]ome major developments are in the offing and so, with the [three] of us about to be in one location over thanksgiving, I thought it would be a good idea to meet and discuss."  Ex. PP, Email Chain of 11/18/2015.  The email further

provides that, "[t]he Heyco Board of Directors has unanimously approved resolutions surrounding the potential deals, which include deal fees payable to the minority Directors (Harry Largey and Hank Klumpp), [Michael] and me.   I include the Resolutions here for the sake of full transparency." *Id*.  It is unclear whether there was any further discussion of the sale between the siblings; however, on December 18, 2015, the potential sale was disclosed to shareholders via a letter which provided,  "Please take notice that the Heyco Board of Directors has voted to explore recap possibilities for Heyco, including the possible sale of the operating divisions. For this reason we are not opening a share redemption window in 2016."  Def. SOMF ¶228; *see also* Ex. K, Dear Director/Shareholder Letter "Heyco, Inc. 2015 Overview"

By April 2016, after the Board began exploring a potential sale, it received thirteen letters of intent from prospective buyers with potential bids ranging from $45 million to $127.5 million, including an offer for $127.5 million from Penn Engineering. Def. SOMF ¶¶230, 231.   After receiving the offer from Penn Engineering, Plaintiff was asked to consent to the sale, but he refused.   Def SOMF ¶231; Pl. Resp. SOMF ¶231.  The parties dispute why Plaintiff objected to the sale.  Def SOMF ¶232; Pl. Resp. SOMF ¶232. Defendants contend that Plaintiff was concerned about the impact the financial transaction might have on his divorce proceedings and assert, *inter alia*,  that  in an email to William, Plaintiff stated "I will not sign off on anything regarding the sale of Heyco in the next 30 to 45 days.  That's suicide for me.  I'm all for the sale but it needs to occur after I'm divorced."  *See* Ex. RR, June 2, 2016 Email from Steve to William.  At his deposition, however, Plaintiff testified that he "didn't like the way the sale was going down.  It was very hush-hush. As a member of the voting trust, I wasn't consulted, brought in for even a face-to-face meeting to even discuss it so, like I said, I was opposed to it."  Ex. D., Steven Dep., T90:2 92:3

Despite Plaintiff's objection, the sale of Products to Penn Engineering for $130 million, an increase over the initial offer of 127.5 million, was approved by Unanimous Written Consent of the Shareholders.  Def. SOMF ¶10; *see also* Ex. L., July 2016 Unanimous Written Consent of Heyco, Inc. regarding Asset Purchase Agreement with Penn Engineering.  The Unanimous Written Consent of the Shareholders is signed by William, Susan, and Michael on behalf of the Jemison Family Trust, but there is no signature line for Plaintiff.  Ex. L., July 2016 Unanimous Written Consent of Heyco, Inc. regarding Asset Purchase Agreement with Penn Engineering.

 In connection with the sale of Products, the Heyco Board approved the payment of commissions of $1.95 million and $7.8 million, respectively, to Michael and William and commissions to Mr. Largey and Mr. Klumpp of approximately $884,000 each.  Def. SOMF ¶¶ 241-42.  Following the sale of Products, each Heyco shareholder also received a distribution of $200 per share.  *Id*. at 4; Pl. Resp. ¶¶14.

### E.    The Sale of Metals

Prior to selling Products, the Board of Directors had contemplated selling Metals.  Def. SOMF ¶245.  Mr. Klumpp testified at his deposition that he had long been interested in selling the subsidiary because it was not doing well and required regular influxes of capital from Heyco to keep it afloat.  *Id*. at ¶246; *see also* Ex. F., Deposition of Hank Klumpp ("Klumpp Dep.")  T91:6-9:6.  Accordingly, the November 6, 2015 Unanimous Written Consent issued by the Board of Directors expressed an intention to explore a sale of Metals.  Def. SOMF ¶250; *see also* Ex. K November 6, 2015  Unanimous Written Consent.  At that time, one potential purchaser, Boway, had expressed an interest in purchasing Metals.  Def. SOMF ¶¶251, 253; *see also* Ex. K, November 6, 2015  Unanimous Written Consent.  Despite meetings with Boway in 2015 and 2016, the sale eventually fell through.  Def. SOMF ¶252.  Metals also received some interest from two other

9

potential purchasers. Olin and Aurubis, who also eventually walked away from the potential sale. *Id*. at ¶260.

In 2016, the Board of Directors hired the firm Stevens & Lee Griffin to perform an Employee Stock Ownership Plan ("ESOP") Feasibility Analysis of Metals. *Id*. at ¶ 261. December 13, 2016 report estimated Metals' value between $18 and $21 million, using a projection for the Company's 2016 earnings, because the actual year-end financials were not yet available. *Id*. at ¶ ¶265; *see* Ex. AA, December 13, 2016 Stevens and Lee Valuation.  However, using the actual complete financial data for 2013 to 2015, Stevens & Lee valued the company between $11.5 million and $14.0 million.  Def. SOMF ¶266; *see* Ex. AA, December 13, 2016 Stevens and Lee Valuation.

At the December 2016 Board Meeting, Michael expressed an interest in purchasing Metals. Def. SOMF ¶270; Pl. Resp SOMF ¶270.  In January 2017, Michael, through Hummock Holdings, a company formed and owned by Michael and other members of his family, made an offer of $15 million, which was rejected.  Def. SOMF ¶271.  Ultimately, on April 10, 2017, Metals was sold to Hummock Holdings, Inc., for $17.65 million.  *Id*. at ¶¶18, 279.  The sale was approved by a Unanimous Written Consent of the Board of Directors, with the exception of Michael who recused himself from the vote.  Def. SOMF ¶¶281,282; *see also* Ex. N, March 25, 2017, Unanimous Written Consent.  Although the November 6, 2015 Unanimous Written Consent of the Heyco Board provided for William and Michael to split a 7.5% commission from the sale of Metals, the commission was waived with respect to Michael, because the Board indicated that a commission for him would be inappropriate, given the nature of the sale.  Def. SOMF ¶285.  The rest of the board members similarly agreed to waive their commissions, as well.  *Id*. at ¶ 286.

The parties dispute whether the sale price was representative of Metals' true value. Plaintiff claims that Metals was sold for over $30 million below value. Plaintiff's expert opined that certain funds held in Heyco's operating account should have been attributed to Metals, which would have increased its value. *See* Ex. CCC, Expert Report of Ronald Seigneur. Plaintiff's expert further opined that Metals' value at the time was approximately $54 million, significantly more than the $17.65 million Michael paid for it. *Id.* Defendants's Expert challenges Plaintiff's expert's analysis on several bases, particularly his re-allocation of the Company's operating cash. *See* Ex. AAA, Expert Report of Sam Rosenfarb. In addition to the report of their own expert, and the Stevens & Lee valuations, Defendants point to the valuations of Heyco generated by Plaintiff and his ex-wife as part of their divorce proceedings, which occurred contemporaneous with the sale of Products and Metals, to support their contention that the sale of Metals was for fair market value. Def. SOMF ¶¶321-331; Pl. Resp SOMF ¶¶321-331. Indeed, the consulting company hired by Plaintiff's ex-wife valued Metals at $12.3 million in 2016. Def. SOMF ¶271, 323; *see also* Ex. DD, September 9, 2016 Six Consulting Valuation. In contrast, the expert from Plaintiff's divorce case valued Metals at negative $31.8 million in 2016. Def. SOMF ¶331; Pl. Resp. SOMF ¶331; *see also* Ex. EE, March 22, 2017, Masten Valuation

The parties also dispute when Plaintiff was informed of the sale of Metals *See* Def. SOMF ¶288; Pl. Resp SOMF ¶288. Plaintiff testified that he learned of the sale after it was completed; while William contends that his son told Plaintiff about the sale of Metals in March 2017. Def. SOMF ¶288; Pl. Resp SOMF ¶288. Regardless, the sale proceeded without Plaintiff's approval and the Jemison Family Trust papers approving the sale do not include a signature line for Plaintiff. Def. SOMF ¶290. William, Michael, and Susan signed off on the sale for the Jemison Family Trust; as did the Heyco Board of Directors, and the other voting shareholders: the Largey Trust

11

and Mr. and Mrs. Klumpp. *Id*. at ¶291.  Contemporaneous with the sale of Metals, Heyco's only remaining asset, the Company adopted a dissolution plan, memorialized in Unanimous Consents, such that the $17.6 million was distributed to the Company's shareholders along with a tranched distribution of the remaining cash from Heyco's operating account. *Id*. at ¶348.

In 2017, following the sale of Metals and the dissolution of Heyco, Plaintiff filed the instant lawsuit against Defendants, asserting several claims for breach of fiduciary duty and unjust enrichment: Count 1, Breach of Fiduciary Duty – Self-Dealing, against Michael in his capacity as trustee of the Jemison Family Trust; Count 2, Breach of Fiduciary Duty – Impartiality, against Michael and William in their capacities as trustees of the Jemison Family Trust; Count 3, Breach of Fiduciary Duty --Willful Misconduct, against  Michael and William in their capacities as trustees of the Jemison Family Trust;  Count 4, Breach of Fiduciary Duty – Conflict of Interest against  Michael and William in their capacities as Directors of Heyco; Count 5, Breach of Fiduciary Duty--Loyalty and Self-Dealing against Michael and William in their capacities as Directors of Heyco; Count 6, Breach of the Duty of Care against Michael and William in their capacities as Directors of Heyco; Count 7, unjust enrichment claim against Michael. *See* ECF No. 1, Compl.  Defendants move for summary judgment on all counts.

## II.      Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of*

*Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  *Anderson*, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial."  *Id.* at 331.  On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim."  *Id.*  Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999).  In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.

*Anderson*, 477 U.S. at 249.  Credibility determinations are the province of the factfinder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

## III.   Analysis

### A.   Breaches of Fiduciary Duty

Plaintiff argues that Defendants breached their duties both as trustees of the Jemison Family Trust, and as Directors of Heyco as a result of their actions in connection with 1) the provision and forgiveness of the loans to Michael and William; 2) the commissions paid to Michael and William in connection with the sale of Products; and 3) the sale of Metals.

Defendants move for summary judgment on all of these claims, arguing that Plaintiff cannot establish that they breached their fiduciary duties to Heyco's shareholders, as each of the challenged transactions were approved by the Company's Board and permitted under New Jersey law.  ECF No. 44-1, Def. Br. at 9-11.  Defendants further argue that as members of Heyco's Board of Directors, Defendants' decisions were protected under the business judgment rule.  *Id.* at 18-22.  Moreover, Defendants argue that Plaintiff's claims against Defendants as co-trustees are equally unavailing, because William, Michael and Susan acted upon a majority vote, and Plaintiff cannot establish either self-dealing or willful misconduct.  *Id.* at 33-38.

### 1.   The Claims Against Michael and William as Directors of Heyco

14

Under New Jersey law, directors of a corporation are expected to "discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent people would exercise under similar circumstances in like positions."  N.J.S.A. § 14A:6–14.

However, New Jersey courts have long recognized that

> [a] decision made by a board of directors pertaining to the manner in which corporate affairs are to be conducted should not be tampered with by the judiciary so long as the decision is one within the power delegated to the directors and there is no showing of bad faith.

*In re PSE & G Shareholder Litig.*, 801 A.2d 295, 306 (N.J. 2002) (citing *Exadaktilos v. Cinnaminson Realty Co.*, 400 A.2d 554, 555 (N.J. Super. Ct. 1979)).  This doctrine, known as the "the business judgment rule," has been "fashioned as a means of protecting a board of directors from being questioned or second-guessed on conduct of corporate affairs except in instances of fraud, self-dealing, or unconscionable conduct."  *Maul v. Kirkman*, 637 A.2d 928, 937 (N.J. App. Div. 1994).  The business judgment rule "is a rebuttable presumption."  *Id.*  The initial burden is "on the person who challenges a corporate decision to demonstrate the decisionmaker's 'self-dealing or other disabling factor.'  If a challenger sustains that initial burden, then the 'presumption of the rule is ... rebutted, and the burden of proof shifts to the ... defendants to show that the transaction was, in fact, fair to the company.'"  *In re PSE & G*, 801 A.2d at 307 (quoting *Maul*, 637 A.2d at 937).  "Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task" as "the burden ... is to show irrationality."  *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005).  "In defining whether the business judgment rule applies to insulate the actions of [the] board of directors . . . [one] 'generally asks (1) whether the actions were authorized by statute or by charter, and if so, (2) whether the action is fraudulent, self-dealing or

15

unconscionable.'" *Seidman v. Clifton Sav. Bank, S.L.A.*, 14 A.3d 36, 52 (N.J. 2011) (quoting *Green Party of New Jersey v. Hartz Mountain Indus., Inc.*, 752 A.2d 315, 326 (N.J. 2000)).

Here, Defendants argue that summary judgment should be granted on all of the breach of fiduciary duty claims against them in their capacity as directors of Heyco, because each of the challenged actions complied with the New Jersey Business Corporations Act ("NJBCA"). Def. Br. 13-17. In that regard, Defendants explain that New Jersey law permits a corporation to "lend money to…any director or officer…whenever in the judgment of the directors, such loan…may reasonably be expected to benefit the corporation." Def. Br. at 9 (quoting N.J.S.A. 14A:6-11 ). They further emphasize that the loans were documented by promissory notes, and were made while the Company was in good financial health. Def. Br. at 13. Similarly, they argue that "[t]he Heyco Board was empowered pursuant to N.J.S.A. 14A:6-8(3) to determine its members' compensation, which included its ability to vote on commissions from the sales of the subsidiaries." *Id*. at 11. In Defendants' view, the commissions paid to Michael and William were akin to a "golden parachute agreement" and were reasonable and fair under the circumstances. *Id*. at 13. With respect to the sale of Metals, Defendants argue that it, too, was consistent with New Jersey law's governing transactions between a corporation and one of its directors. Def. Br. at 14-17. Defendants maintain that "Plaintiff has not and cannot rebut the presumption of the business judgment rule to the Board's decisions because these decisions were made in full compliance with the applicable New Jersey statutes, and he has not and cannot present any facts that the complained of actions were fraudulent, self-dealing or unconscionable." *Id*. at 22 (internal quotation marks and citation omitted).

In response, Plaintiff argues that there are disputed issues of material fact with respect to Defendants' compliance with the New Jersey corporate statute, as to each of the challenged

transactions. Pl. Br. 17-21. With respect to the loans and commissions, Plaintiff asserts that N.J.S.A. 14A:6-8(3) "only permits directors to pay themselves reasonable compensation." *Id*. at 17. Plaintiff submits that the reasonableness of the payments cannot be determined on a summary judgment motion; Plaintiff emphasizes that Michael and William "paid themselves $500,000 each, in the form of loan forgiveness, and then commissions of $7.8 million ([William]) and $1.95 million (Michael) . . . in addition to significant salaries and bonuses – in 2015 alone, [William] took approximately $800,000 in salary and bonus, and Michael took approximately $600,000 in salary and bonus." *Id*. at 17-18. Furthermore, Plaintiff contends that although New Jersey's corporate statute permits companies to make loans to directors, if the loan "may reasonably be expected to benefit the corporation," Defendants cannot establish that the loans were for Heyco's benefit. *Id*. at 18. With respect to the sale of Metals, Plaintiff argues that Defendants cannot prove that the transaction was "fair and reasonable as to the corporation at the time it is authorized, approved, or ratified," because "Defendants never actually took Metals out to market and never engaged in any arm's length negotiations with independent, disinterested third-parties; instead, William and Michael just decided together to sell Metals to Michael." *Id*. at 20. As such, Plaintiff asserts that Defendants are not entitled to the protections of the business judgment rule. *Id*. at 20-21.

### a)   The Loans and Commissions

Plaintiff seeks to overcome the business judgment rule's presumption of propriety with respect to the challenged transactions, by asserting that they constituted self-dealing and/or a breach of the duty of loyalty. First, I assess the application of the business judgment rule to the two $500,000 loans issued to Michael and William in 2012, and subsequently forgiven by Heyco in increments until it was fully absolved, and the commissions paid to Michael and William. I find

that there is no dispute of material fact with respect to whether the business judgment rule applies to those transactions.

NJBCA plainly gives directors the authority, by vote of a majority of the board, to establish reasonable compensation for themselves.   *See* N.J.S.A. 14A:6-8(3).   Under the statute, a transaction is not a conflict of interest, if "[t]he board, by the affirmative vote of a majority of directors in office and irrespective of any personal interest of any of them, shall have authority to establish reasonable compensation of directors for services to the corporation as directors, officers, or otherwise."  *Id*.  The NJBCA also permits a corporation to

> lend money to, or guarantee any obligation of, or otherwise assist, any director, officer or employee of the corporation or of any subsidiary, whenever, in the judgment of the directors, such loan, guarantee or assistance may reasonably be expected to benefit the corporation. The loan, guarantee or other assistance may be made with or without interest, and may be unsecured, or secured in such manner as the board shall approve, including, without limitation, a pledge of shares of the corporation, and may be made upon such other terms and conditions as the board may determine.

N.J.S.A. § 14A:6-11.

Because it is within the Board of Director's discretion to set director compensation, and to determine if a loan to its directors is in the Company's benefit, the burden is on Plaintiff to rebut the presumption that the commissions and loans to William and Michael were not an appropriate exercise of the Board's business judgment, because the decisions were, somehow, fraudulent, self-dealing, or unconscionable.  Plaintiff plainly has not done so. Indeed, "[t]he business judgment rule's presumption of good faith and regularity carries particular force when the challenged decision concerns employee compensation."  *Seidman v. Clifton Sav. Bank, S.L.A.*, No. A-4033-07T2, 2009 WL 2513797, at *9 (N.J. Super. Ct. App. Div. Aug. 19, 2009).  Although Plaintiff asserts that these transactions constituted a conflict of interest, the NJBCA clearly provides that a director approving his or her own compensation, is not a conflict of interest, and thus, does not

constitute a breach of the duty of loyalty.  N.J.S.A. 14A:6-8(3).  Moreover, the record plainly demonstrates that the two disinterested directors, Mr. Klumpp and Mr. Largey, both voted in favor of the commission payments to Michael and William, as well as the issuance and forgiveness of the $500,000 loan to each brother, as part of Michael and William's compensation as directors. Plaintiff may very well have chosen differently if he were on the Board of Directors, but under the business judgment rule, "bad judgment, without bad faith, does not ordinarily make officers individually liable."  *Maul*, 637 A.2d at 614.  Plaintiff has not presented any evidence that these decisions were made in bad faith.

Plaintiff has also failed to establish that the Board of Directors breached their duty of care in authorizing the loans and the commissions.  "[D]irectors must discharge their duties in good faith and act as ordinarily prudent persons would under similar circumstances in like positions." *Francis v. United Jersey Ban*k, 432 A.2d 814, 822 (N.J. 1981).  As part of exercising a board of director's duty of care, "the directors are required to obtain all material information reasonably available to them when making the decision, and act with the requisite care in the discharge of their duties."  *Seidman*, No. A-4033-07T2, 2009 WL 2513797, at *10 (citing *PSE & G*, 801 A.2d 295).  In assessing whether a director has breached his or her duty of care, "the court's inquiry is not into the substantive decision of the [director], but rather is into the procedures employed by the board in making its determination. In that regard, there is no prescribed procedure that a [director] must follow."  *Jurista v. Amerinox Processing, Inc.,* 492 B.R. 707, 760 (D.N.J. 2013).

Plaintiff has not identified any facts suggesting that the Board of Directors was anything less than fully informed when it approved the issuance and forgiveness of the loans, as well as the commissions paid to Michael and William.  At the time the loans were initially issued, the Company was indisputably on solid financial footing.  *C.f. Jurista*, 492 B.R. at 761 (finding that

plaintiff adequately alleged a breach of the duty of care where directors issued a dividend to themselves at a time when the "insolvent, inundated with debts, and completely incapable of paying such debts as they became due."); *see also Abrams v. Koether,* 766 F. Supp. 237, 251 (D.N.J. 1991) (director breaches his or her duty of care "when the director makes uninformed or nondeliberated decisions on behalf of the corporation," or "where the terms of a transaction approved by the director on behalf of the corporation are so inadequate ... that no person of ordinary, sound business judgment would assent to them.").  The 2012 Board of Directors Book indicates that the company had net sales of $93.7 million, net income of $10.1 million and $30 million cash on hand.  *See* Ex. H, 2012 Board of Director Meeting Book.  In that connection, between 2012 and 2015, Heyco consistently issued dividends to its shareholders.  Def. SOMF ¶202, Pl. Resp. SOMF ¶202.  Moreover, the Board's meeting book for the annual board meetings between 2012 and 2015, includes a summary of the status of the loans, including the amount forgiven thus far, and the outstanding loan balance.  *See* Ex. H, 2012 Board of Director Meeting Book; Ex. I, 2013 Board of Directors Meeting Book; Ex. J, 2014 Board of Directors Meeting Book; Ex. K., Heyco, Board of Directors Meeting Book.  At each meeting, the Board of Directors reviewed the loans before forgiving the next increment.   Further, Heyco's controller was also involved in determining the appropriate accounting mechanisms for the loans and arranging for Defendants to pay the requisite payroll taxes. *See* Ex. NN, January 11, 2013 Email from Richard Cardone to William Jemison and Michael Jemison "Recap – Heyco, Inc. Loans to Officers,"; Ex. OO, December 2014 and December 2015 Emails from Richard Cardone to William and Michael Jemison and Loan Overview.

Similarly, with respect to the commissions paid in conjunction with the sale of Products, the Board performed its due diligence and considered the impact of the commissions on the

Company's finances; Plaintiff has not identified any facts which would suggest otherwise.   In November 2015, the Board expressed that it "believe[d] it [was] in the best interests of the Shareholders and the Corporation to explore potential transactions in order to properly access the value of both subsidiaries and perhaps enter into transactions involving one or both."  Ex. K, November 6, 2015 Unanimous Written Consent.  The Board further found that

> the expectation of large values for Heyco Products, Inc. and Heyco Metals, Inc. is due to management's sustaining and increasing gross margins, mitigating overhead and innovating into new product lines while never failing to pay a dividend or decreasing the dividend paid over that paid in the preceding year; and . . . in recognition of such factors, the Board has determined that if a sale of either or both subsidiaries is concluded, a bonus be paid to senior management out of the proceeds of such sale.

*Id*.  Accordingly, the Board found it appropriate for William and Michael to share a commission of 7.5% of the net proceeds from each transaction.  *Id*.  They similarly found it appropriate to pay the two other directors a commission for their efforts in connection with securing the transaction, as well.  *Id*.  On this motion, other than conclusory assertions and innuendo, Plaintiff has failed to present any evidence suggesting that the Board's decision to issue the commissions and loans should not be entitled to the protections of the business judgment rule.

Accordingly, I find that Defendants are entitled summary judgment on the breach of fiduciary duty claims against Michael and William with respect to the issuance of the two $500,000 loans and the commissions from the sale of Products.

### b)   The Sale of Metals

Plaintiff's claims, with respect to the sale of Metals, are similarly unavailing.  On its face, the sale of Metals to Hummock Holdings, an entity formed by Michael and his family members, might seem to constitute a self-dealing transaction which would fall outside the scope of the

business judgment rule.  A "director has a conflicting interest in the transaction" if he or she  "either appears on both sides of a transaction or expects to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."  *In re D'Amore*, 472 B.R. 679, 690 (D.N.J. 2012).  However, the NJCBA expressly provides procedures for determining whether transactions between a corporation and one or more of its directors, directly or indirectly, constitute a conflict of interest.  *See* N.J.S.A. 14A:6-8 ("Director Conflicts of Interest").  Under the statute, transactions which would typically be void or voidable due to a conflict of interest, are permissible if any one of the three following conditions is met:

> (a) The contract or other transaction is fair and reasonable as to the corporation at the time it is authorized, approved or ratified; or
>
> (b) The fact of the common directorship or interest is disclosed or known to the board or committee and the board or committee authorizes, approves, or ratifies the contract or transaction by unanimous written consent, provided at least one director so consenting is disinterested, or by affirmative vote of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or
>
> (c) The fact of the common directorship or interest is disclosed or known to the shareholders, and they authorize, approve or ratify the contract or transaction.

N.J.S.A. 14A:6-8(a)-(c).  Moreover, the common or interested directors may be counted in determining the presence of a quorum at a board or committee meeting at which a contract or transaction described in subsection 14A:6-8(1) is authorized, approved or ratified.

Here, subsection (b) is clearly satisfied.[4]  First, Michael recused himself from the Board of Director's vote, and there is no dispute that that the other three members of the Board of Directors

---

[4]     Moreover, subsection c is seemingly satisfied, as well, because all of Heyco's shareholders who possessed voting shares voted in favor of the transaction, despite being aware of Michael's involvement with Hummock Holdings.  *See* Ex. N, Unanimous Written Consent of the Shareholders – Metals.  Nonetheless, because Plaintiff also challenges the Jemison Family Trust's vote in favor of the transaction, I do not consider subsection c.

– William, Mr. Klumpp and Mr. Largey,  -- were aware that Michael, through Hummock Holdings, was the purchaser of Metals.  Nonetheless, they unanimously approved the transaction.  Notably, when a board of directors acts unanimously, the statute only requires one director to be disinterested.  Thus, even assuming, as Plaintiff argues, that "[t]here is certainly no way for Defendants to establish on summary judgment that [William] was disinterested with respect to the sale, which was entered into specifically for the purpose of providing his brother and his nephew ongoing employment," Pl. Br. at 20, the transaction was, nonetheless, free from a conflict of interest, because both Mr. Klumpp and Mr. Largey were disinterested.  Plaintiff has not proffered any dispute of material fact with respect to whether Mr. Klumpp and Mr. Largey were disinterested with regard to the sale of Metals.  There is no indication that either individual stood to receive a greater financial benefit from the sale of Metals than the other shareholders.  Critically, all of the Directors waived their right to seek a commission from the sale of Metals.  *See* Ex., N Unanimous Written Consent of the Board of Directors – Metals.

Moreover, like with the payments of the loans and commissions, Plaintiff has not established that Defendants breached their duty of care with respect to the Metals transaction. Plaintiff argues that Metals was sold for significantly less than it was worth.  Pl. Br. at 19-20.  As explained, *supra*, focus of the duty of care is "not into the substantive decision of the [director], but rather is into the procedures employed by the board in making its determination. In that regard, there is no prescribed procedure that a [director] must follow." *Jurista,* 492 B.R. at 760. Indeed, with respect to a sale of substantially all of a Company's corporate assets, such as here, "the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end." *Collins v. Warrell,* No. A-4140-08T2, 2011 WL 3300193, at *7 (N.J. App. Div. Aug.

3, 2011) (quoting takeovers *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 180 (Del. 1986)).

Here, there is no indication that the Board, specifically William who spearheaded the negotiations on behalf of Heyco, did less than its due diligence. Early on, the Board recognized that potential purchasers for Metals might be limited due to the nature of that subsidiary's business and its prior performance and, in fact, the 2015 Unanimous Written Consent of the Board of Directors, wherein the Directors expressed their intent to explore a sale, provides "with respect to Heyco Metals, Inc., the pool of potential acquirers is more restricted." *See* Ex. K November 6, 2015 Unanimous Written Consent. Between 2015 and 2016, the Company entered negotiations with two potential purchasers, both of which fell through. With no other purchasers on the horizon, in January 2017, Hummock Holdings offered $15 million for Metals, which the Company rejected. Over the next few months, Michael, on behalf of Hummock Holdings, and William, on behalf of Heyco, negotiated and ultimately, agreed on a sale price of $17.65 million, which the rest of the Board, and the shareholders approved. The only evidence which Plaintiff identifies in support of his position that Defendants breached their duty of care in this regard, aside from Michael's relationship to the transaction, is that the sale was for less than what his expert posits Metals was worth. However, the sale price of $17.6 million was in line with the two independent evaluations performed by Stevens & Lee in 2016, which valued Metals between $11.5 million and $14.0 million using historical 2013-2015 financial data, and between $18 and $21 million using projections for the Company's 2016 financial results. S*ee* Ex. AA, December 13, 2016 Stevens and Lee Valuation. It was also higher than the $12.3 million figure proffered by Plaintiff's ex-wife during Plaintiff's divorce, and substantially higher than the negative $31.8 million valuation

performed by Plaintiff's expert in the same divorce. *See* Ex., DD, September 9, 2016 Six Consulting Valuation; Ex. FF March 22, 2017 Masten Valuation.

Based on the information available to them at the time, the Board concluded that $17.65 million was a fair price for Metals. It matters not that Plaintiff's expert came to a different conclusion for purposes of this litigation. Indeed, the Court's focus in applying the business judgment rule is on the procedure utilized, rather than the result. Here, it is clear that the Board garnered all of the relevant information prior to approving the sale. Moreover, the sale price is not far beyond the realm of the various valuations, such that it suggests a wholly inadequate or uninformed sales process, or that the Directors failed to take any steps to obtain a fair sale price. *See Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 243 (Del. 2009) (explaining that if "the directors failed to do all that they should have under the circumstances, they breached their duty of care."). Accordingly, I find that Defendants are entitled to summary judgment on Plaintiff's claims against them as Directors of Heyco, stemming from the sale of Metals.

### 2.    The Claims Against Michael and William as Trustee of the Jemison Family Trust

Here, Plaintiff argues that Defendants breached their duties as trustees because they did not act "solely in the best interests of the beneficiaries." Pl. Br. at 7. In Plaintiff's view, "[t]he three transactions – the loans, the commissions, and the sale of Metals to Michael's family – were all also undeniably either entered into by the trustee for the trustee's own personal account or [were] otherwise affected by a conflict between the trustee's fiduciary and personal interests. . . because [William] and Michael benefited significantly from each of the transactions and the transactions decreased the value of the Trust." *Id*. at 7 (internal quotation marks and citation omitted"). With respect to the loans, and the commissions, Plaintiff notes that there was no trustee vote to approve or disprove either transaction. *Id*. at 8. Moreover, with respect to the sale of

25

Metals, Plaintiff asserts that although William, Michael and Susan voted as a majority to approve the sale, it nonetheless constituted a breach of fiduciary duty because it was a self-dealing transaction. *Id.* at 8-13. Accordingly, Plaintiff argues that Michael violated his duty not to engage in a transaction in which he had a personal interest, and that William violated his duty to prevent Michael from committing a breach of trust, and "also violated his duty . . . to act solely in the best interests of the beneficiaries and to exercise his control over Heyco to protect the beneficiaries' interests by voting to approve the self-interested transaction." *Id.* at 13.

### a) The Scope of Plaintiff's Claims Against Defendants as Trustees

First, I note a discrepancy with respect to the scope of Plaintiff's claims as alleged in the Complaint and the arguments raised in opposition to the instant motion for summary judgment. In his opposition brief, Plaintiff argues that Defendants violated their duties as trustees of the Jemison Family Trust "[w]hen [Defendants] took loans from Heyco," "[w]hen [Defendants] paid themselves commissions of $7.8 million and $1.95 million" and "[w]hen [Defendants] sold Metals, the last remaining asset of Heyco, which is controlled by the Trust, to Michael and his children." Pl. Br. at 7.

However, the Complaint alleges only that Defendants breached their duties as trustees based solely on their conduct during the of sale Metals. *See* Compl. Counts 1, 2, 3. Specifically, Count 1 alleges that Michael "owed fiduciary duties to Plaintiff, as a beneficiary of the trust, including a duty of loyalty" and he "breached that duty by selling Heyco Metals, the only substantial asset of [Heyco] to himself, at a substantially lower price than its fair market value." Compl., Count 1, ¶¶27-28. Similarly, Count 2 alleges that Michael and William "as trustees of the Jemison Family Trust, owed fiduciary duties to Plaintiff, as a beneficiary of the trust, including a duty of impartiality" and they "breached their duty to treat trust beneficiaries impartially by

favoring [Michael], a beneficiary of the Trust through the sale of the only substantial asset of [Heyco] to [Michael], at a price substantially below fair market value." Compl., Count 2, ¶¶31-32. Count Three also alleges that Michael and William "owed fiduciary duties to Plaintiff, as a beneficiary of the trust, including a duty to exercise reasonable care in the administration of the trust. Defendants Michael S. Jemison and William D. Jemison committed willful misconduct in violation of their fiduciary duty of care when they sold the only substantial asset of [Heyco] at a price that they knew was so far below market value as to be objectively unreasonable to Defendant Michael S. Jemison." Compl., Count 2, ¶¶35-36. Indeed, the only claims based on the other two transactions at issue – the loans to William and Michael and the commissions in connection with the sale of Products – are Plaintiff's breach of fiduciary duty claims against Defendants as directors of Heyco, *see* Compl., Counts 5 and 6, and the unjust enrichment claim against Michael, see Compl., Count 7.

A plaintiff cannot amend his or her legal theories by way of his briefing in opposition to a motion for summary judgment. *See HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 700 F. Supp. 2d 681, 683 n.7 (D.N.J. 2010) ("Plaintiffs cannot amend their pleadings in a summary judgment motion."); *see also Nykiel v. Borough of Sharpsburg,* 778 F. Supp. 2d 573, 587 (W.D. Pa. 2011) ("[a]t the summary judgment stage, the proper procedure for plaintiff to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). To the extent Plaintiff intended to premise his breach of fiduciary duty claims against Defendants as trustees on actions other the sale of Metals as alleged in his Complaint, he had ample opportunity to file a motion for leave to amend his complaint, but he did not do so. Accordingly,

I limit Plaintiff's breach of fiduciary duty claims against Defendants, in their capacity as trustees, to the sale of Metals, consistent with the Complaint.

### b)   Defendants' Duties as Trustees

Trustees owe the trust and its beneficiaries a duty of loyalty and a duty to exercise reasonable skill and care. *F.G. v. MacDonell*, 696 A.2d 697, 704 (N.J. 1997) (citing Restatement (Second) of Trusts §§ 170, 174); *see also In re Koretzky's Estate,* 86 A.2d 238 (N.J. 1951) (noting that trustee's most "fundamental duty" is his duty of loyalty to trust's beneficiaries); *Gilliam v. Edwards,* 492 F. Supp. 1255, 1266 (D.N.J.1980) (stating that trustee's duty is "to administer the trust solely in interest of the beneficiaries"). New Jersey's Uniform Trust Code, which provides the default rules governing law of trusts in the absence of contrary terms in the Trust Agreement, requires trustees "to administer the trust with undivided loyalty to and solely in the best interests of the beneficiaries." N.J.S.A. §3B:31-55(a); *see also* Restatement (Third) of Trusts § 93 (2012) ("A breach of trust occurs if the trustee, intentionally or negligently, fails to do what the fiduciary duties of the particular trusteeship require or does what those duties forbid."). In that regard, " [a] sale, encumbrance, or other transaction involving the investment or management of trust property is presumed to be affected by a conflict between personal and fiduciary interests if it is entered into by the trustee with: . . . a corporation or other person or enterprise in which the trustee, or a person that owns a significant interest in the trustee, has an interest that might affect the trustee's judgment." N.J.S.A. §3B:31-55(c)(4). Where a trustee fails to act in the best interest of the beneficiaries, he or she is liable for harm resulting from a breach of his or her duties. *MacDonell*, 696 A.2d at 704. Here, the parties dispute whether Defendants breached their fiduciary duties to the trust when they, along with Susan, voted the Jemison Family Trust's shares in favor of approving the sale of Metals to Hummock Holdings, an entity owned by Michael and his family.

28

Defendants argue that Plaintiff has not demonstrated an issue of material fact with respect to the propriety of their decision-making as trustees.  Def. Br.  34-37; Def. Reply Br. 5-10. First, Defendants assert that because the majority of the trustees – Michael, William, and Susan – voted on behalf of the Trust to authorize the sale of Metals, there was no breach of duty.  Def. Br. at 36-37.  Second, Defendants argue that the sale of Metals was not a self-dealing transaction because it was not a transaction with Michael, personally, but rather through Hummock Holdings, and William dealt impartially with Michael when approving the sale.  Def. Br. 36-37.  Further, Defendants assert that the transaction was in the best interest of the trust's beneficiaries as there were no other viable prospective buyers, and Hummock Holdings offered a fair price for Metals, consistent with its valuation.  Def. Reply Br. at 8.  Moreover, Defendants argue that requiring Michael and William to step aside when deciding how to vote the Trust's shares, would be contrary to the intent of the Jemison Family Trust.  Def. Reply Br. at 5-7.   Defendants further note that at the time the Jemison Family Trust was created in 1999, Defendants were both already on Heyco's Board of Directors and were presidents of Products and Metals, respectively.  Def. Reply Br. at 6.  In that regard, Defendants argue that  it would be "preposterous to imply that Mr. Jemison intended the equal division of the Trust's interests among his issue at his death to require [William] and [Michael] to either quit the Board when becoming Trustees (thus erasing the entire Jemison family from the family business's Board), or to immediately relinquish their positions as Trustees and leave the majority of voting shares divided equally between Sue and Plaintiff, neither of whom had any involvement in the business."  *Id*. at 6.

In response, Plaintiff asserts that there are genuine disputes of material fact regarding whether Defendants breached their duties to the Jemison Family Trust beneficiaries.  Pl. Br. 9-16. Plaintiff argues "the fact that [William] and Michael, along with Susan, voted as a majority to

approve the sale of Metals to a company owned by Michael and his children in no way immunizes Defendants if that sale violated their duties as trustees." Pl. Opp. at 9. In Plaintiff's view, the sale of Metals was a self-dealing transaction which constitutes a breach of the duty of loyalty and a violation of the provisions of the NJUTC, which require trustees to act in the best interest of trust beneficiaries, and avoid transactions with the trust. *Id*. at 9-10 (citing N.J.S.A. 3B:31-55(b) and N.J.S.A. 3B:31-5(c)(4)). Further, Plaintiff contends that the fact that Heyco may have complied with the requisite corporate formalities in approving the sale of Metals does not exculpate Defendants from liability for their breaches as trustees. Pl. Br. 13-16. Plaintiff avers that "as trustees, who also happen to be corporate directors, Defendants were required to exercise their control over Heyco exclusively in the best interests of Plaintiff, and they were required to avoid all self-interested transactions, even if those transactions might be permitted under the corporate statute." *Id*. at 15.

I find that Defendants are entitled to summary judgment on Plaintiff's breach of fiduciary duty claim for two reasons. First, there is no dispute that Defendants, as co-trustees of the trust were permitted to vote the Trust's shares of Heyco in order to approve the Board's decision to sell Metals and second, as explained, *supra*, Plaintiff has not demonstrated that there is a genuine issue of material fact regarding whether the transaction was a self-dealing one.

As co-trustees of the Jemison Family Trust, all four of the Jemison siblings had the authority to exercise the Trust's voting shares in favor or against the sale of Metals. In the absence of a contrary provision in the trust agreement, trustees are vested with a wide range of powers, including the power to vote corporate stock owned by the trust. *See* N.J.S.A. § 3B:14-23(n),(p) (providing that every fiduciary shall have the power "[t]o vote in person or by proxy, discretionary or otherwise, shares of stock or other securities held by the estate or trust" and "and to consent to

corporate sales"). Here, the Jemison Family Trust Agreement, expressly grants the trustees the power to "vote in person or by proxy, or consent for any purpose, in respect to any stocks or securities constituting assets of the trust," and to "participate in any plan . . . and any action thereunder or to any . . . sale or other action." Ex. GGG, Jemison Family Trust Agreement ¶¶2-3.

Moreover, the Trust Agreement does not require the co-trustees to act unanimously. *See* Ex. GGG, Jemison Family Trust Agreement. In the absence of a provision requiring unanimity, the NJUTC provides, "[c]o-trustees who are unable to reach a unanimous decision may act by majority decision." N.J.S A § 3B:31-48(a). Here, that is precisely what occurred. The trustees, with the exception of Plaintiff, acted by majority decision and chose to vote the Trust's shares in favor of the sale of Metals. There is some dispute as to whether Plaintiff was invited to vote on the Metals transaction, or even aware of it; Plaintiff testified that he learned of the sale after it was completed, while William contends that his son told Plaintiff about the sale of Metals in March 2017. *Compare* Ex. C, Deposition of William Jemison, ("William Dep.") T29:24-30:12 (William testified that his son told Plaintiff about the sale of Metals "in early/mid-March 2017) *with* Ex. D, Steven Dep T127:22-128:17 (testifying that Plaintiff learned of the price paid for Metals after the sale) Nonetheless, I do not find that such a dispute is material because even if Plaintiff had been presented with the opportunity to vote on the transaction, it would not have changed the outcome. Should Plaintiff have voted against ratifying the Board's decision, the other three trustees could, nonetheless, have acted by majority decision, which is precisely what occurred.

Like directors of a corporation, trustees of a trust are subject to a duty of loyalty. "It is axiomatic that the most fundamental duty owed by a trustee to the beneficiary of a trust is the duty of loyalty. This duty is imposed on the trustee independent of any trust provision because of the

fiduciary relationship which arises from the creation of the trust." *Wolosoff v. Csi Liquidating Trust*, 500 A.2d 1076, 1081 (App. Div. 1985).  Further, in voting corporate stock held by a trust, the trustees' fiduciary duties impose a duty to vote the stock in such a way as to promote the interests of the trust's beneficiaries. *See In re Koretzky's Estate*, 86 A.2d at 248 ("In voting shares of stock fiduciaries are under a duty to vote in such a way as to promote the interests of the beneficiaries"); N.J.S.A. 3B:31-55(f) ("In voting shares of stock of a corporation or in exercising powers of control over similar interests in other forms of enterprise, the trustee shall act in the best interests of the beneficiaries and shall vote to elect or appoint directors or other managers who will manage the corporation or enterprise in the best interests of the beneficiaries.").  Here, Plaintiff has not demonstrated that Defendants acted in a manner inconsistent with the best interest of the beneficiaries of the Jemison Family Trust.

Plaintiff argues that "corporate officers and directors, who are also trustees of a trust that owns stock in that corporation, have an affirmative duty under the UTC to use their corporate powers exclusively in the best interests of the beneficiaries of the trust. To the extent that would create any conflict of interest, the trustees would have to resign," when voting the shares of the trust.  Pl. Br. at 6-8.

Plaintiff's position is essentially that Defendants were precluded from voting, as trustees, to approve any of Heyco's corporate actions because they were also directors and officers of Heyco and the underlying corporate transaction would benefit Michael and William.  Plaintiff is incorrect. First, Plaintiff has not identified any New Jersey law or statute which precluded Defendants from holding their positions as directors or officers of their company, simply because they were also trustees of the Jemison Family Trust.  Such a position is untenable, and inconsistent with both New Jersey trust law and the intent underlying the Trust Agreement.  Indeed, at the time the Jemison

32

Family Trust was created in 1999, William and Michael had both been members of Heyco's Board of Directors for several years. Despite that, the Trust Agreement provided for both Michael and William, along with Plaintiff and Susan to become co-trustees of the trust upon their father's death. To the extent there was a conflict between Defendants' positions as Directors of Heyco and trustees of the Jemison Family Trust, it was sanctioned by the Trust Agreement. In *Rosencrans v. Fry,* 91 A.2d 162, 169 (N.J. Ch. Div. 1952), testator left shares of a closely-held corporation to the defendant Fry, who had been active in running the corporation, and some shares to his widow and Fry as trustees for the benefit of his wife and nephews but subject to an option in favor of Fry to purchase. *Id.* at 164. Thereafter, however, the widow asserted that Fry breached his duties as trustee by virtue of his involvement in the company's affairs. *Id.* The court noted that the testator was "a man of considerable business experience. He could not but have appreciated the delicate role which he assigned to [the trustees]. [He] presumably was confident that [the trustees] would act with fairness in discharging [their] corporate duties and [their] fiduciary duty under the [trust instrument]." *Id.* at 167. Accordingly, it concluded that "Since the testator himself requested that Fry be elected president of the company, neither the receipt of nor proper increases in salaries or bonuses could Per se be deemed to violate the trust. The testator contemplated that Fry would receive adequate compensation for his services to the company notwithstanding his role of co-trustee of the stock." *Id.* at 168. Here, like in *Rosencrans*, the Jemison Family Trust essentially sanctioned Defendants' dual roles as Trustees of the Jemison Family Trust and Directors of Heyco.

Second, Plaintiff is effectively seeking to hold Defendants, in their capacity as trustees, liable for actions taken by Heyco's Board of Directors. Here, Plaintiff has not alleged that Defendants impaired the Trust's ability to carry out its obligations or exercise its voting rights. There was no harm to the trust in that regard. Rather, Plaintiff's challenge is focused on the

underlying terms of the transaction approved by the Board.  Plaintiff has not identified any case law suggesting that co- trustees of a trust may be liable for how they voted, and caused the Trust, as Heyco's controlling shareholder, to vote in favor of the transaction.  Nor did the Court's independent review reveal any relevant law.  To the extent Plaintiff is dissatisfied with the terms of the underlying deal, his dissatisfaction is with the decisions made by the corporation, and Defendants, not in their capacity of trustees of the trust, but rather in their role as corporate officers. However, Plaintiff cannot simply side-step the business judgment rule by arguing that Defendants' breached their duties as trustees.  As such, the mere fact that Defendants voted the Trust's shares to approve the sale does not establish a breach of fiduciary duty in their capacity as trustees. Defendants are entitled to summary judgment on this claim.

### B.      Unjust Enrichment

Plaintiff alleges that Michael was unjustly enriched by effectuating the sale of Metals to himself for less than the Company's true value, as well as taking the loans and commission in connection with the sale of Products.  *See* Compl ¶¶50-51.

To establish a claim for unjust enrichment, a plaintiff must prove that (1) at plaintiff's expense; (2) defendant received benefit; (3) under circumstances that would make it unjust for defendant to retain said benefit without paying for it. *Maniscalco v. Brother Intern. Corp. (USA)*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009).  Retention of a benefit without payment is not unjust unless "the plaintiff expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred." *Assocs. Comm. Corp. v. Wallia*, 511 A.2d 709, 711 (N.J. App. Div. 1986) (quoting *Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 335 (N.J. App. Div. 1966)). Thus, unjust enrichment cases "involve[] either a direct relationship between the parties or a mistake on the part

of the person conferring the benefit." *Fasching v. Kallinger*, 211 510 A.2d 694, 700 (N.J. App. Div. 1986).

Here, Plaintiff's claim for unjust enrichment is duplicative of his claims for breach of fiduciary duty.  As explained, *supra*, Plaintiff has not carried his burden of demonstrating that any of the challenged actions were beyond the scope of Defendants' authority as Directors of Heyco, or Trustees of the Jemison Family Trust, respectively.   Accordingly, there is no material dispute of fact with respect to whether Defendants' were entitled to the renumeration they received. Accordingly, I grant Defendants' motion for summary judgment as to the unjust enrichment claim (Count 7).

## IV.   **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED**.

Date: March 29, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge